## EX PARTE WALKER.

1. On an application to the Supreme Court for a prohibition, or other remedial writ, to vacate certain orders of the Chancery Court, in the appointment of a receiver and the imprisonment of the petitioner for contempt of court, in refusing to pay over to the receiver certain moneys in his hands, the bill will not be examined and construed with the same degree of strictness as to technical accuracy as on demurrer : if it shows that the court had jurisdiction of the parties and the subject-matter, although defective in some matter which might be supplied by amendment, it will be held sufficient, and a prohibition will not be awarded.

2. Therefore, in this case, a prohibition was refused, because, it was held, the bill was sufficient to give the court jurisdiction, being filed against a trustee, by persons who showed an interest in the trust fund, to prevent its waste and misapplication.

3. The appointment of a receiver is a matter of discretion with the chancellor ; and where a bill is filed by the creditors of an estate, against a person who has obtained possession of funds belonging to it by representing himself to be the executor, and who is alleged to be insolvent, a receiver is properly appointed.

4. A chancellor has power under the Code (§§ 561, 3008, 3009, 3010, 3011) to issue an attachment for contempt of court, against any party to a cause who refuses obedience to his orders.

5. Where the refractory party is in court, and has personal notice of the order with which he refuses to comply, it is not necessary that he should be served with a writ of execution of the decretal order, nor with notice that a motion will be made for an attachment against him.

6. It is not a valid objection to the order for the issue of an attachment, that it directs the imprisonment of the refractory party until he complies with the violated decree, directing him to pay over certain moneys in his hands to a receiver, and also gives bond to appear at the next term of the court and answer for his contempt.

7. Nor can the defendant claim, as a matter of right, that he should be allowed to give bond for the forthcoming of the money in his hands before the order for an attachment is made : that is a matter to be addressed to the sound discretion of the chancellor, who may order the attachment without it.

APPLICATION by Benj. W. Walker for the writ of prohibition, *mandamus*, or other remedial process, to vacate certain orders of the Chancery Court of Macon, the Hon. JAMES B. CLARK presiding, made in a certain cause therein pending, wherein William Dougherty and others are complainants, and said Walker and others are defendants ; one of said orders appointing a receiver in said cause, and directing the

petitioner to pay over to him certain moneys in his hands; and the other directing the issue of an attachment against the petitioner for contempt of court, in refusing obedience to the previous order. A transcript of the proceedings in said cause is filed with the petition, as a part thereof, and from it the following facts appear :

The complainants allege, that they are resident citizens of Georgia, and are creditors by judgment or specialty of the estate of James C. Watson, late of Muscogee county, Georgia, deceased ; that letters testamentary on the estate of said Watson were granted in 1843, by the Court of Ordinary of said county of Muscogee, which county was the domicil of said Watson at the time of his death, to said Ben. W. Walker and John H. Watson, who gave no bond, or other security, for the faithful execution of their said trust, as none was required by the laws of Georgia ; that said executors returned to said court no inventory of their testator's estate, nor did any other act towards its legal administration, but, colluding and confederating with the other distributees of the estate, entered into an arrangement with them for the distribution of said estate, by which its creditors were entirely defeated in the collection of their debts; that afterwards, to-wit, in 1847, the letters testamentary previously granted to said executors were revoked by said Court of Ordinary of Muscogee county, and one Mansfield Torrance was appointed administrator *de bonis non* of said Watson's estate ; that said Torrance was afterwards removed from said administration by said court, and said William Dougherty, one of the complainants, was afterwards appointed administrator *pendente lite* of said estate ; that said Walker afterwards applied to said Court of Ordinary to vacate the said order revoking his letters testamentary, being induced to make the application by the expectation that the Congress of the United States would soon make an appropriation of a large amount to the estate of said Watson, which sum the said Walker wished to get into his possession ; that said application was refused by said Court of Ordinary, and said Walker appealed from its decision to the Superior Court ; " that said appeal is yet pending, undecided and undetermined, leaving the said judgment of the Court of Ordinary unreversed and in full force.

The bill further alleges, that Walker, notwithstanding the said revocation of his letters testamentary, still claimed to be the executor of said Watson in Georgia, and to have the right to collect all moneys due to his estate ; that complainants, said Walker being wholly insolvent, applied to said Court of Ordinary, as by the laws of Georgia they had a right to do, for an order requiring him to give bond, with security, for the faithful administration of all moneys belonging to said Watson's estate which might come to his hands ; but the court refused the application, on the ground that it had no jurisdiction to make such an order after the revocation of his letters testamentary ; that said Walker, in the meantime, filed a copy of said Watson's will in the Probate Court of Macon county, in Alabama, and thereupon letters testamentary in this State were granted to him by said Court ; that an act of Congress was passed in 1852, "for the relief of the legal representatives" of said Watson, making an appropriation of a large sum of money, to-wit, about $25,000, in payment of a claim which said Watson held against the United States; "that Walker threatened to apply for said money in both characters or capacities, asserting his right to it to be unquestionable in either one or the other, and, as complainants are informed and believe, did so apply to Mr. Corwin, then secretary of the treasury, who refused the application, on the ground that Walker, after said revocation of his letters testamentary, was not the executor or legal representative of said Watson in Georgia.

It further alleges, that soon afterwards, a change having taken place in the office of secretary of the treasury, Walker threatened to renew his application for said money, and thereupon complainants filed their bill against him in the Superior Court of Muscogee county, and enjoined him from further proceedings to collect said money ; that nevertheless said Walker again made application to the treasury department, then filled by James Guthrie, the successor of said Corwin, "and demanded that said money should be paid to him as executor of said Watson either in Georgia or Alabama"; that complainants again resisted his application, and the said secretary of the treasury thereupon decided that the said money could only be paid, under said act of Congress, to the

legal representatives of said Watson in Georgia, and that said Walker, his said letters testamentary having been revoked by a court of competent jurisdiction in Georgia, was not entitled to receive it; that Walker again renewed his application to said Guthrie, for said money, in April, 1854, "as the legal representative of said Watson in Georgia, falsely representing himself to be such executor and representative"; that of this application complainants had no notice or intimation whatever, until after said Walker had obtained from said Guthrie an order for the immediate payment of said money to him "as the executor and representative of said Watson in Georgia," and the money had been paid to him accordingly; that of the money so received by Walker, a portion was retained by James Abercrombie, of Macon county in this State, in payment of a claim held by him against the estate of said Watson, and other portions were deposited by said Walker with divers other persons, all of whom are made defendants to the bill, for specified purposes.

The prayer of the bill is, that a receiver may be appointed to take charge of the fund; that the several defendants may be required to pay over to him the money in their hands, and he restrained and enjoined from making any other application of it; that the money, when collected, may be paid over to the said William Dougherty, or to such other person as shall then be the legal representative of said Watson in Georgia, to be duly administered according to the laws of that State; and also for general relief.

An injunction was granted according to the prayer of the bill, on complainants' entering into bond. The defendant Walker afterwards filed his answer; but it is unnecessary to notice its allegations, as this motion is predicated on the statements of the bill only. Appended to his answer is a copy of the written opinion of Mr. Guthrie, directing the payment to Walker of the money appropriated by Congress, on the ground that the decision of the Court of Ordinary in Georgia, revoking Walker's letters testamentary, had been reversed on appeal by the Supreme Court of that State. At the May term, 1854, of the Chancery Court of Macon, a receiver was appointed in the cause, and the defendants were ordered to pay over to him the money in their hands received

from said appropriation. On the same day another order was made, reciting that Walker was in court when the previous order was made, and had personal knowledge of it, and that satisfactory evidence was produced to the court that he had afterwards left the town where the court was sitting, without complying with said order, and with a view of evading it; and ordering that said Walker therefore stand committed for a contempt of court, and that the register issue an attachment against him, directing the sheriff to arrest him, and to keep him in close custody "until he pay over the said sum of money in his hands, and enter into bond, payable to the register, in the sum of one thousand dollars, with good security, conditioned to appear at the next term of said court and answer said contempt."

SAML. F. RICE and THOS. H. WATTS, for the motion, argued the case orally and in writing; contending that, as the bill showed on its face a want of equity, the chancellor had no jurisdiction of the case made by it, and therefore all his orders were void, and prohibition ought to be awarded to arrest proceedings under them. After the delivery of the first opinion, they made application for a re-hearing, in response to which the opinion pronounced by the Chief Justice was delivered. No brief of their main argument (on the equity of the bill) has come to the Reporter's hands, but the substance of it is incorporated in the argument on the petition for re-hearing, which is subjoined:

If the court had jurisdiction of the case made by the bill, still it exceeded its jurisdiction, and departed from the law and practice in each order made by it. There is no affidavit sustaining the main allegations of the bill, except that of William Dougherty, one of the complainants. Walker's answer is responsive, and denies the principal allegations of the bill; it is not outweighed by any evidence or affidavit, and it is clear that, in such case, the chancellor violated the law and practice in appointing a receiver.—Thompson v. Diffenderfer, 1 Maryland Ch. R. 489, and cases there cited.

The order of commitment is void, not being authorized by any law or rule of practice. "If the court has jurisdiction regularly, and in the commitment exceeds the power of the

law (as if a man should be committed for life for disobedience of a lawful order), the proceeding would be *coram non judice*, and the order merely void."—*Ex parte* Alexander, decided in Kentucky, in July, 1853, and reported in the November number (1853) of the American Law Register, p. 44; also, Bickley v. Commonwealth, 2 J. J. Marsh. 572. In *Ex parte* Alexander, it is also said: "The power to imprison for contempt is derived merely and absolutely from the necessity of the case; no further punishment, therefore, can be inflicted lawfully, than is necessary in the strictest sense. So, when there is a commitment for the purpose of coercing the payment of money, or the delivery of property, the court should provide in the order that the party be discharged on giving security for the money in some form, when he has not got it, and on paying the price of the property, if it shall turn out that the party cannot deliver it; and so of other cases, in order that nothing shall be inflicted but of necessity. No absolute power exists in this country; it cannot exist in a republic." It is doubtful whether *habeas corpus* could issue in this case from a circuit judge, a chancellor, or primary court; but prohibition certainly lies from this court on any such void order.

The court is also requested to notice the fact, that the order was made on the 6th of May, and was executed on Walker on the 12th. There is no evidence that he had the money on the 12th, and in fact he did not. The order should, at all events, have allowed him to give security for it, in the event he did not have it when arrested; for, although he had it on the 6th of May, he might have lost it, or been deprived of it, by some accident or misfortune, before the arrest, and the order should have provided for such contingency. The order goes beyond what was necessary in this respect, and is void. It also goes beyond what was necessary, in requiring not only payment of the entire sum, but also a bond for $1000 to appear at the next term to answer for a contempt, of which the chancellor had already convicted him, and ordered him to stand committed.

The fact that Walker was in court when the order was passed appointing a receiver, and ordering him (the receiver) to enter into bond to be approved by the register, and that

he (Walker) had notice of such order, and that he " left the town of Tuskegee a short time after the passage of said order, without complying with the terms thereof, and with a view of evading the same," do not constitute one of the "cases" "to which the power of the several courts of this State" is confined, in the issue of attachments and infliction of summary punishment for contempt, by the 561st section of the Code.—The Commonwealth v. Deskins, 4 Leigh 685.

Nor do the aforesaid facts bring the case within the influence of sections 3008, 3009, 3010, or any other section of the Code.—1 Smith's Chancery Practice, 428, 429 to 432. Sections 3008, 3009 and 3010, apply only to final orders, rules and decrees.—Buffum's case, 13 New Hamp. 14. It is certain that the Code of Alabama did not intend to enlarge the power of the courts to punish for contempts, and did not design to make the power of the courts of this State greater than the power of the British courts in matters of contempt. But the intention was to diminish the power of the courts here, and to restrict the power to the cases enumerated expressly in the Code. This is the fair and reasonable construction.—Code, § 561 ; *Ex parte* Thatcher, 2 Gilman 167. No English court possesses the power which was exercised by the chancellor in this case. The receiver had no authority to receive the money until he executed the required bond, nor until it was approved by the register : Walker could not be in default or contempt in leaving Tuskegee before that bond was executed or approved. Was Walker to remain there until it was executed?

But suppose the execution and approval of the bond was not essential to the authority of the receiver to receive the money ; then there was not even "the service of a copy of the order or decree" on him, nor was there the issue or service of " a writ of execution of the order," which is essential to ground process of contempt.—1 Smith's Ch. Pr. 429 ; 3 Chitty's Eq. Dig., 1858, § 8 ; Buffum's case, 13 New Hamp. 15. The English practice governs this case, unless repealed by statute.—Gates v. McDaniel, 3 Port. 356.

An order of court, adjudging a party guilty of contempt, must always show, on its face, the facts upon which the exercise of the power is based. If it fails to show this, it cannot

stand.—The People v. Turner, 1 California 152; *Ex parte Field*, 1 *ib.* 187; *Ex parte* Thatcher, 2 Gilman 170. "The appellate court may revise and reverse" (or prohibit) the judgment of any other court in Alabama, adjudging a party guilty of contempt, "when it exceeds its jurisdiction, by treating that as a contempt which, in law, is no contempt, and cannot be."—*Ex parte* Thatcher, 2 Gilman 170. No other court in this State than the Supreme Court, can revise the action of the Chancery Court in a matter of contempt, and the writ of prohibition is the appropriate writ for controlling the Chancery Court in this respect.

Walker has been deprived of his liberty, "without due process of law," contrary to our supreme law. He has been convicted of a contempt, without any service of the order which he is charged with disobeying, or any issue or service of a writ of execution of the order. Courts of justice have never yet adopted as a basis of action in matters of contempt, the mere fact that a party had heard of, or had verbal notice of, an order. The basis of action must be in writing, and appear of record. There must be service evidenced on the record in some legal manner. The mere evasion of service of an order is not a contempt.—4 Leigh 685. The conviction by the chancellor does not pretend that Walker evaded the service of a writ of execution of the order, or that such writ of execution ever issued, but only that he left Tuskegee after notice (not service) of the order appointing the receiver, &c., "with a view of evading the same" (that is, said orders).

The court is also requested to examine the bill again, and the question of jurisdiction therein stated. It is not denied that the court had jurisdiction of the case stated in the opinion; but it is insisted, that the case stated in the opinion is totally and radically different from that stated in the bill. The bill may contain the allegations which the bill imputes to it; but it certainly contains other allegations in connection therewith, which make the case totally different from that stated in the opinion. The bill shows that the fund in question was a debt due by the United States (ubiquitous in its nature), and was collected by (Walker) an executor duly appointed in Alabama, and that this Alabama executor had the fund in Alabama, and that he had given bond and secu-

rity here, which is not pretended to be insufficient. These facts, which give a fixed character to the case, are not hinted at in the opinion. The bill shows that the complainants do not claim under or through our laws which govern administrations and the distribution of assets amongst creditors, but in defiance and contempt of our own laws. The opinion gives no such idea of the bill. If the complainants (creditors living in Georgia) showed by their bill that they claimed under our laws (and not in opposition to our laws) regulating administrations, the opinion might be correct. But the principal thing in the bill is, that the Georgia law must govern the administration of the fund, as amongst all the creditors of the estate (some of whom the bill shows reside in Alabama); and if the Supreme Court cannot decide that the Georgia laws must govern the administration of the funds as between all the creditors (including Alabama creditors), there is no jurisdiction of the case made by the bill; for all else in the bill is merely incidental or accessorial to this position. Where the principal falls, the incident or accessorial falls with it.—Pond v. Lockwood, 8 Ala. 669 (5th headnote).

The complainants must be held to the case they have made. They cannot make a new case. They do not aver or show any right, as creditors, under any Alabama law. They do not pretend they ever filed their claims or presented them in Alabama, although more than eighteen months elapsed before the bill was filed, which is a bar under our law. The law is clear, that the fund must be administered in Alabama, and according to Alabama law, amongst all creditors not barred; and that until the administration here is completed, no part of the fund can be transmitted to Georgia.—Dent's Appeal, decided by Supreme Court of Pennsylvania in 1854, and reported in the May No., 1854, of the American Law Register, p. 446 ; Smith v. Union Bank, 5 Peters 518 ; Preston v. Melville, 8 Clarke & Finnelly 1 ; Childress v. Bennett, 10 Ala. 751 ; Haydock's Appeal, 7 New Hamp. 503 ; Churchill v. Boyden, 17 Vermont 319 ; Stacy v. Thrasher, 6 How. 44.

Kane v. Paul, 14 Peters 33, has no bearing on the case ; for that case proceeds upon the ground that the effect of the act of Congress of 24th June, 1812, is, to render null

and void any administration granted in the District of Columbia upon the estate of any citizen of any State in the Union, after letters testamentary or of administration have been granted thereon "in any of the United States or the territories thereof." The administration granted in the District of Columbia to Kane, was held wholly void, and therefore the executor appointed in Maryland recovered. But the Supreme Court of the United States has never decided, that where an executor has been duly appointed in one State, there could not be a valid grant of administration in any other State; on the contrary, the validity of appointments in different States has always been admitted.—Stacy v. Thrasher, 6 How. 44.

The debt due by the United States, until collected, was ubiquitous—was as much in Alabama as in Georgia (15 Peters 1); and from this very nature of such debt, as well as from the terms of the act making the appropriation to pay this debt, any representative of Watson's estate, appointed lawfully in any State, had authority to receive it and administer it. Walker received it—never had it in Georgia, but has it in Alabama—and our creditors must be paid out of it, and may enjoin others from reducing or wasting it in any manner whatever.—Harvey v. Richards, 1 Mason 381.

It is clear that Walker had been appointed executor of Watson both in Georgia and Alabama, and that in his application for the money to the secretary of the treasury, he made known both his appointments, and claimed that he was entitled to it under both, and that he was certainly entitled to it under his appointment in Alabama, even if his Georgia appointment was revoked. In other words, he contended that his appointment as executor in Alabama gave him at least equal authority with any Georgia administrator *de bonis non*, if not paramount authority, to receive the money. The secretary did not decide or order it to be paid to him as Georgia executor, but to "Benjamin W. Walker as executor &c., of James C. Watson." This decision is not affected by the reasons assigned for it by the secretary, and his decision does not convert the fund into a Georgia fund, or exempt it from the operation of the laws of Alabama governing administrations.

JOHN A. ELMORE and WILLIAM DOUGHERTY, *contra :*

On this motion, the only inquiry is, whether the chancellor had jurisdiction of the question presented to him, and which he decided ; for, before the interference of this court can be invoked, he must have transgressed his authority. The rule is settled in Morgan Smith's case (23 Ala. 94), as well as in other American and English cases, that where the matter is within the cognizance of the court, a prohibition will not be granted ; and on this point all the judges are agreed, only differing in the application of the rule to the facts of that case.

There is some difficulty, perhaps, in finding a satisfactory definition of jurisdiction in the books, as applied to the powers of a court. Bouvier defines it to be " a power, constitutionally conferred upon a judge or magistrate, to take cognizance of and decide causes according to law, and to carry his sentence into effect." See, also, 1 Story's Equity, §§ 57, 58. We define it to be, the power or authority to pronounce the law on the case presented, and to pass upon and settle by its judgment the rights of the parties touching the subject-matter in controversy, and to enforce such sentence. The derivation of the word—*jus dicere*—and the practice of the courts, prove this to be substantially correct. When it is said that a court has no jurisdiction of a matter, we mean that it can pronounce no judgment in the case on the rights of the parties—that it cannot even render a judgment in favor of the defendant, establishing his right to the subject-matter in dispute, which will bind the plaintiff. This is the test of the jurisdiction. The opinion that there is no jurisdiction in cases where a demurrer to the bill would be sustained, is erroneous ; if the demurrer was allowed because of the want of jurisdiction, the proposition is true ; but if a decree could be rendered for the complainant, in relation to the subject-matter, in any aspect in which the bill could be filed, the court would have jurisdiction. If it be determined that there is a want of jurisdiction in every case where the allegations of the bill are defective, because there is a want of equity, writs of prohibition will become numerous, unless the Legislature interferes, or this court retraces its steps.— In this case, the chancellor had the power to consider the

questions submitted, and to render a decree thereon binding on both parties as to their right to this fund. If the prohibition is granted by this court, will it not be on the ground that Walker, as against these complainants, is entitled to the fund? and will not this be a judgment on the rights of the parties to the fund, a judgment on the subject-matter in dispute, and not on the jurisdiction of the court? We admit, that loose *dicta* are to be found that courts cannot, in certain cases, give relief; but this means only that, under the rules of the court, the party has not presented a case entitling him to relief, and not that the court had no jurisdiction. In 7 Gill & John. 210, it is said, that " chancery can have no jurisdiction, where it can give no relief"; and this is true in a qualified sense, and was true as applied to the facts of that case, the lands in controversy being beyond the jurisdiction of the court.

On the issue presented by the counsel for the motion, as to the equity of the bill, every allegation of the bill is to be taken as true. The main argument here rests on the statement, that Walker had been removed from his office of executor, by the Court of Ordinary in Georgia, before he received the money; and this admits, that, if he had then been executor in Georgia, the relief asked would have been given under the facts of the bill : it claims for Walker an exemption from liability on the ground of his fraud. The argument is, that Walker was not executor in Georgia, and although he fraudulently represented himself to be so, and thereby and in that character obtained the fund, yet, because of the fraud, he received it wrongfully ; and the money is no part of the estate of Watson, but is still the money of the Government, for which Walker is liable to a suit by the Government only ; and that the debt is still due to the estate of Watson by the Government, and to that source the representative in Georgia must look, and not to Walker. Another aspect of it is, that Walker, being the representative in Alabama, had the right to reduce this fund to possession, although an ancillary representative only ; and if he first collected it, no matter by what means, he has the right to retain it, as a fund belonging to the local administration, and that as such local administrator he had the right to collect it under the act of Congress of 1812, and to retain it as assets of his local administration.

The administrator of the domicil is the original or principal representative ; all others are local and ancillary, or subordinate to it.—Story's Conflict of Laws, §§ 514, 518. It is true that, within the respective limits of the States conferring their authority, and as to the assets belonging to their respective jurisdictions, each is independent of the other, at least as to their powers over their respective assets, and the payment of the debts of the deceased ; but, although each is independent of the other in some respects, the powers of each beyond their respective States are very different. The bill charges Walker with having received the money appropriated by Congress to the legal representatives of Watson, and that this money belonged to the assets of Watson's estate in Georgia, and was subject to administration in that State; that it was a trust fund for the payment of Watson's debts there, according to the laws of that State, and that the complainants are, by the laws of that State, as judgment and specialty creditors, entitled to a preference in payment from this fund, over simple contract creditors.

In the case of Harrison v. Mahorner, 14 Ala. 829, the facts were : Hooe died domiciled in Virginia, leaving his will; two of the executors qualified in that State ; Mahorner took out letters on this will in the State of Mississippi, and had them duly recorded in the County Court of Pickens county, Alabama, under the statute of this State (Clay's Digest, § 31, p. 227), and then brought an action of debt as such representative against Harrison, in this State. The representatives in Virginia never recorded their letters in this State. It was held, that the representative mentioned in the statute, was the original, and not the ancillary representative, who was entitled to sue in the courts of this State. The case of Kane v. Paul, 14 Peters 33, runs on all fours with that of our own court, and with the case under consideration. The act of Congress of 1812 authorizes executors and administrators in the States and Territories to sue for and recover debts due to the deceased in the District of Columbia without taking out letters within that District. This statute, in effect, confers on foreign representatives precisely the same powers as our statute, but imposes no conditions on them. Paul qualified in Maryland, the place of the domicil of the testator, as his exec-

utor; the testator had a claim against the Government; after his death, and while the claim was pending, letters of administration, with the will annexed, were granted to Kane by the Orphans' Court in the District of Columbia. The claim was allowed, and Kane received the money from the Government. Paul brought an action against Kane to recover the money : and it was held, that Paul was entitled to recover; that the letters granted to him entitled him to recover, without his having the letters of administration granted by the Orphans' Court of the District of Columbia repealed or revoked.—14 Peters 33. It makes no difference that Paul was the executor, and that Dougherty is an administrator *pendente lite*. His authority to collect the assets of the estate, by suit or otherwise, is as ample as if he was the executor, and he is the representative of the domicil.

Again; in reference to the act of Congress, in 15 Peters 6, the court say : " The United States, in their sovereign capacity, have no particular place of domicil, but possess, in contemplation of law, an ubiquity throughout the Union ; and the debts due by them are not to be treated like the debts of a private debtor, which constitute local assets within his own domicil. On the contrary, the administrator of a creditor of the Government, duly appointed in the State where he was domiciled at his death, has full authority to receive payment, and give a full discharge, of the debt due to his intestate, in any place where the Government may choose to pay it, whether at the seat of government, or at any other place where the public funds are deposited." And again, on pages 7 and 8, it is said : " In effect, it made all debts due from persons within the District, not local assets, for which a personal representative would be liable to account in the courts of the District, but general assets, which he had full authority to receive, and for which he was bound to account in the courts of the State from which he received his original letters of administration."

The terms of the act of Congress, although embracing an ancillary representative, are controlled by the general principles of law ; and under these decisions of the United States courts, are held to mean those persons only who fill the measure of the description. No one is a full representative of a

deceased person, but the representative of the domicil; all others are but partial, local representatives. This is the doctrine also asserted in Harrison v. Mahorner, and no other can be maintained on principle. In such cases, the rule of construction is, " *Quod verba equivoca, et in dubio posita, intelliguntur in digniori et potentiore sensu.*" This is fully illustrated by the examples given in Gregory's case, and by the case itself; as where there are two classes of things or persons and the term includes both, none but the worthier and higher class ( *propter excellentiam*) shall be intended.—Gregory's Case, 3 Coke (6 Part) 19. Under the authority of the above cases, Walker had no authority, as executor in Alabama, to collect this fund. If he had taken out letters of administration in the District of Columbia, Dougherty, as the original representative, could have recovered it in an action at law. Can Walker's letters in Alabama give him greater rights than letters in the District of Columbia?

But this case is stronger than the one in Harrison v. Mahorner, in this respect. In the latter, the representative in Virginia had not filed in the proper courts of this State his letters, or shown any intention to avail himself of the benefits of the act of this State. Under the act of Congress it is as if Dougherty and Walker had both, under a law of the United States like that of Alabama, filed their letters; and, in effect, the controversy is between them. Dougherty has been earnest in pressing his claims to this fund; both in fact were claiming it, but the secretary of the treasury refused to pay the fund to either, until the controversy as to the revocation of the letters of Walker in Georgia was settled by the courts in that State; and in this decision, he distinctly said, that the representative in Georgia was entitled to the fund, and he should pay it to no other person. Dougherty, satisfied with this decision of Mr. Guthrie, returns home, to await the decision of this question about the letters of Walker in the Georgia courts. Some time after Walker secretly, as far as Dougherty was concerned, renews his application, and by false representations obtains the money.

If Walker, when he received the fund, had been in fact the executor in Georgia as well as in Alabama, he would have to account for it in the courts of Georgia, as being the place of

the general, principal administration, and not in Alabama, the place of the local, partial administration.

Dougherty's right to this fund as the representative of the domicil is unquestionable. That right is as trustee, first, for creditors, second, for the legatees or distributees. If Dougherty could litigate this question with Walker, there would be no difficulty ; but he, as the foreign representative, cannot bring any suit in this State, as there is a representative here. Code, § 1934.

Under these circumstances, what is to be done ? Walker has no right to the money ; it belongs to Dougherty, as part of the estate of Watson in Georgia. Dougherty cannot sue Walker. There are in Georgia judgment and specialty creditors, who are preferred in the payment of debts by estates under the laws of Georgia. This fund is a trust fund to pay these debts. Walker has obtained it by falsehood and fraud, and has wasted the estate; and avowed that he intended to devote this money to the use of his family. We are told that a Court of Chancery can afford no relief, that there is a want of equity in the bill. Such a charge on our courts is a stigma on their character—that they cannot make Walker disgorge the fruits of his fraud. The complainants show all the elements of equity—fraud in the defendant in obtaining a fund, a want of right in him to it, a right in another as trustee, an inability in the trustee to sue, and their own rights as the parties in whose favor the trust exists, and danger of waste. It is no answer to this, to say that the Government paid, and Walker received, this money wrongfully. One of the first maxims of the law is, that no man shall take advantage of his own wrong or fraud. The whole argument on this point is answered by the case of Kane v. Paul.

When Walker received this fund, on the false and fraudulent representation that he was the executor in Georgia, and claimed it as such, and in that character received it, and when the fund in fact, as is charged in the bill, was assets belonging to the jurisdiction of Georgia, and as such assets he claimed and received it, will he be permitted now to deny that the fund was Georgia assets, and to claim it as Alabama assets? Story says, when a representative has gone out of the jurisdiction of his appointment, and collected assets of

his testator or intestate, he is liable to be sued by any creditor there, upon general principles, and upon the common law as executor *de son tort.* "For it would not lie in his mouth to deny that he had rightfully received such assets, and he could not rightfully receive them except as executor." Story on Con. Laws, § 514. p. 424-5; Campbell v. Tousey, 7 Cowen 64. In all such cases, by the collection of the assets, the person tacitly asserts that he is the executor, and thereby subjects himself to all the liabilities of one, although guilty of no fraud, and cannot deny the fact of that character, or that the assets were the assets of the estate. Yet it is contended, that Walker, by his fraud, stands in a better position than one innocent of this charge, and that he may deny this to be assets of the estate in Georgia.

The bill however, we insist, is filed in a double aspect: the one we have above been considering ; and the other, that Walker is still the executor in Georgia, and in this aspect he stands before the court as the executor in Georgia, having returned this claim in his inventory there, with it collected by him as Georgia assets, insolvent, guilty of the grossest maladministration, without security for his acts, and creditors seeking to secure this fund from waste for their benefit. It is said there are other creditors in Georgia; this is but a want of parties, if true, and not a want of jurisdiction. It is an assumption only ; the fact does not appear on the bill. But, if true, the bill asks that the fund be sent to Georgia, where they reside, and where they can place their claims before the proper tribunal.

It is not true, as urged in argument, that a decree of the court in this State would not protect Walker against the creditors in Georgia, if he should be sued there. This court has jurisdiction of the fund, and its decree is a judgment *in rem,* and binding on the world. When the local administrator has paid the debts of the estate, the assets remaining may be distributed in the place of his appointment among the legatees and distributees, or it may be sent by the order of a competent court to the principal representative for such distribution. In such case, what protects the local administrator from suit by legatees or distributees in another State, if they should find him there?—Code, §§ 1826, 1827. This ar-

gument is based on the fact, that Walker was the executor in Georgia, when he received the assets, when the bill charges he was not, or it is based on the principle that Walker could not deny the character in which he received the assets.

It is also said, there are creditors in Alabama. This is also an assumption: none are mentioned in the bill except Abercrombie, and he is a party and can litigate his rights.— That these creditors would not be bound by a decree against Walker, and could pursue him for these assets. Besides being a judgment *in rem*, Walker is the representative of the creditors here, and every judgment against him and concerning the estate which he represents, unless obtained by collusion, binds all who are interested in the fund. There is no view in which the rights of creditors in Alabama are involved, except the one in which we have been considering this case. If the fund is a Georgia fund, the Alabama creditors are not deprived of any rights by its being sent there: they can appear there in the proper forum, and litigate any matters they please with the Georgia creditors.

The argument derived from the character of the ubiquity of the United States is not entitled to serious consideration. The money was received out of the State of his appointment. If he had received it in Alabama, there might be plausibility in the idea; but the Supreme Court of the United States, in the cases referred to, has declared that this ubiquity exists or enures in favor of the representative of the domicil, and not of the local representative; that this ubiquity and the statute of 1812 makes the assets general and not local assets.— "Administration only extends to the assets of the intestate within the State where it was granted; if it was otherwise, the assets might be drawn out of the State to the great inconvenience of domestic creditors, and be distributed, perhaps on very different terms, according to the laws of another jurisdiction."—Doolittle v. Lewis, 7 Johns. Ch. 45, 47. This Walker is attempting to do by setting up a claim to the fund as local assets belonging to Alabama.

This question will come before this court hereafter in a very different aspect from the one now presented if the prohibition is allowed. When Walker is called upon by the creditors in Alabama to account for this fund, his answer is

ready—"I have no assets belonging to this jurisdiction."— When asked, "Where is the money you got from the Government," he says, "That don't belong to this jurisdiction. I returned it in my inventory in Georgia as belonging to that jurisdiction. I applied for it, and obtained it, as assets of that forum, and in the character of executor in Georgia;" and if he is required, he can prove all these facts to be true. The creditors say, "But you were not in fact the executor in Georgia at the time." Walker retorts, "What is that to you? the Supreme Court of Alabama have decided that I received the money wrongfully, by falsehood and fraud, and that the money I received was no part of the estate of Watson, but was money of the Government wrongfully paid to me, and I am liable to the Government for it—I hold it to pay the Government when I am sued." He laughs in their faces, and, we may add, in the faces of the creditors of Georgia, and in the faces of the courts of both States. He has already put at defiance the courts of Georgia, and has attempted to do the same thing with the Chancery Court of this State. Having failed, he asks the aid of the Supreme Court.

If Walker by any admissions he has made be held liable here for this fund as assets within this State, yet are his sureties bound by such admission? He is utterly insolvent, has wasted the assets of his trust, has avowed his purpose to appropriate this fund to his own use, and on his admission of the truth of the bill he will do so. It is a fact, then, that if the creditors in Alabama get this fund, it will be only through his sureties, who will resist a recovery, and, under the facts and the law, are not responsible for this fund ; and what then becomes of the rights of the Alabama creditors as pressed into the argument? The sureties are not bound by any decision made in this cause, or by any unofficial admissions of Walker or any others.

These considerations all prove, that at least it is questionable if the bill ought not to be sustained ; and in a case of doubt, the prohibition is not allowed. This writ stops all proceedings in the cause, and Walker is turned loose with seventeen thousand dollars in his pocket, belonging to the estate of Watson, either in Georgia or Alabama, utterly insolvent, utterly reckless and dishonest, having wasted the

estate already, and avowing that he intends to waste this fund. The court will surely pause before it permits such a result. How much greater the necessity for consideration, when its act indirectly produces this consummation.

LIGON, J.—The counsel for the relator insists, that the bill in this record does not make out a case of which the Chancery Court of Macon county can take jurisdiction; and thence concludes, that all orders made by the chancellor, in reference to it, are *coram non judice*, and void. If, on examination, such should be found to be the case, we should not hesitate to award the prohibition which is asked.

We have already held, that this court has the power, under the provisions of our State constitution, to prohibit the Chancery Court, where a proper case for the exercise of this power is presented.—*Ex parte* Morgan Smith, 23 Ala. 94. In that case it is held, that, where those courts act without jurisdiction, or where, having jurisdiction of the subject-matter and the parties, they exceed that jurisdiction, by making some order in the progress of the case which is directly and clearly repugnant to some law regulating the exercise of that jurisdiction, and the party injured can have no immediate redress by appeal, writ of error, or any of the ordinary modes pointed out by law, they should be compelled to desist from the execution of such order, or promptly to vacate it, and to this end a writ of prohibition should issue to them.

It is not pretended, in this case, that the order appointing a receiver is repugnant to any law regulating the exercise of the chancellor's jurisdiction over the appointment of such officers; on the contrary, it is admitted to be regular so far as mere practice is concerned. But it is contended, that the court making the order could not rightfully take jurisdiction between the parties on the case made by the bill, and is wholly incompetent to grant the relief sought; in other words, that the court has usurped jurisdiction which does not belong to it, and consequently is without authority to make any valid order in respect to the case.

To ascertain whether this is true, we must look to the case made by the bill, and to that alone, for its statements and allegations must be taken as true on all questions of jurisdic-

tion of the court in which it is filed. That a court of equity has a general jurisdiction over all matters of trust, and the power by way of preventive justice to stay any waste of the trust estate, are propositions of elementary law, which require no citations of authority to sustain them. It is equally clear, that it will exercise this jurisdiction, and exert these powers, on the proper application of any person or persons interested in the trust estate, when their interest is made to appear by the bill, and the existence of the trust and danger of the fund to which it attaches are sufficiently averred. Nor do we esteem it necessary to the exercise of these powers in the first instance, that the bill, which invokes the aid of a court of chancery, should be drawn with such technical accuracy as to defy a demurrer for every special cause relating to parties or form, in respect to which, if it were defective, the defect might be readily supplied by an amendment, which would be allowed as a matter of course. It is enough, if it be shown, by some persons having an interest that the subject-matter is within the jurisdiction of the court, and that the danger and injury sought to be averted are real and pressing. So that, in passing on the question arising on this motion, it is not necessary for the court to decide upon the technical accuracy of the bill in all its details, but simply to inquire, whether, conceding the truth of the substantial allegations of the bill, the court entertaining it had jurisdiction of the subject-matter and the parties.

These things premised, we proceed to a general examination of the bill under consideration. It is filed by persons who represent themselves to be creditors, by judgment or specialty, of the estate of J. C. Watson, deceased, in the State of Georgia, against a resident of the chancery district in this State in which it is exhibited, and other persons citizens of this State; it avers, that Walker, by false representation and fraud, has possessed himself of the funds of the estate to the amount of $25,000, and that he has already misapplied a portion of this sum, and has threatened to misapply and waste the remainder, by converting it to his own use, or that of his family; that the moneys belong to the estate of Watson in Georgia, where he was domiciled at the time of his death, and where administration was granted on his estate; that Walker is wholly irresponsible, and insolvent; and that, if

he is permitted to retain the money in his possession, he will misapply and waste the entire sum, and it will be wholly lost to those who are entitled to it by law. It further avers, that the complainants are preferred creditors of the estate, to an amount largely exceeding the sum in the hands of Walker.

These are the substantial allegations of the bill, and, in our opinion, make out a clear case for the interposition of a court of equity, under its general power over trustees and trust estates, and its ability to lay hold of a trust fund, when it is alleged to be in danger of waste, and to preserve and administer it according to the purposes of the trust.—2 Story's Eq. Jurisp. §§ 826–7–8. In doing this, a receiver is generally indespensable, and is always appointed when applied for.

The application for that officer was here made, and he was appointed by the chancellor. As the court had jurisdiction of the case made by the bill, both as it regards the subject-matter and the parties, we think the appointment of the receiver was clearly within the range of its legitimate powers; and as such appointment was made without violating any rule of law, it must be allowed to stand, and the application for a writ of prohibition must be denied.

Writ of prohibition refused.

CHILTON, C. J.—On a former day of this court, a motion was submitted, by the counsel for the petitioner, for the writ of prohibition, or other appropriate process, to be directed to the chancellor of the Middle Chancery Division, requiring him to vacate an order appointing a receiver in the cause of W. Dougherty et al. v. Walker, pending in the Chancery Court of Macon county; which order requires said Walker to pay over the money, admitted by his answer to be in his hands, and which he received from the United States, as the personal representative of the estate of Gen. Watson, deceased.

The ground relied upon by the counsel of Mr. Walker, in support of their motion, was, that upon the face of the bill, the Chancery Court of Macon was without jurisdiction, and consequently had no power to make the order complained of. This court, in response to that motion, without intending to pass definitively upon the merits of the controversy, but confining itself to the allegations contained in the bill, held, that

the court was not without jurisdiction to make the order, and that having jurisdiction, no prohibition could be granted.

An application is now made to re-hear the cause, and review the opinion then pronounced; and the court is asked, also, to consider as to the *regularity* of the order, as well as of the subsequent proceedings based upon it, by which the petitioner has been deprived of his liberty, and is now in prison for contempt, by reason of his failure to comply with the decree requiring him to pay the money to the receiver.

The counsel for the petitioner again presses upon our consideration the argument that the bill makes no case for relief,—that the former opinion was based upon a partial view of its allegations; and they insist, that, although they should be mistaken in this view, yet the chancellor has transcended his jurisdiction, in ordering an attachment against Walker for contempt, as shown by the record accompanying the proceedings.

Upon a careful review of the opinion, and re-examination of the allegations of the bill, we entertain no doubt of the correctness of our opinion denying the writ of prohibition; and without saying more upon that subject, we will at once proceed to examine the objections taken to the regularity of the proceedings for the contempt.

1. It is urged, that the order appointing a receiver is irregular, because the answer of Walker substantially denies the main allegations of the bill. We are of opinion, however, that there is a grave question of law to be settled in this case, which must materially affect the rights of the parties; that is, whether this fund is to be administered in Georgia, or in Alabama. The defendant insists, that he is the executor in both States, and has the right to administer the fund in either. It appears that the secretary of the treasury, in the opinion pronounced by him awarding the payment of the money to Walker, regarded him as the executor in Georgia, and the inventory attached to the bill of complaint, if it may be called such, shows that Walker has reported this demand against the Government to the Court of Ordinary in Georgia, as assets of his testator's estate, subject to administration there. Now it would be improper for us, perhaps, to anticipate this question by a decision of it upon the bill and answer

merely, as there may be facts which the pleadings do not specifically set forth, having a bearing upon it, and which may hereafter be developed. At all events, such a decision is not called for in response to the present motion. If it should turn out, upon a final hearing, that the fund in Walker's hands, received from the Government, is properly to be regarded as assets to be administered in the State of Georgia, then, as he is insolvent, the complainants have no security whatever for the administration of the fund in that State ; as, in that event, it would be very clear the sureties which he he has given in this State would not be responsible for the fund, not being assets to be administered here. It is conceded by all, that the funds in his hands are assets of Gen. Watson's estate, charged with the payment of its debts ; and placing them in the hands of a receiver is, in our opinion, a precautionary measure fully justified by the nature and circumstances of this litigation. The receiver is an indifferent person between the parties, appointed by the court to take charge of the fund pending the controversy. He is an officer of court, subject to its orders, and may be required to loan out the fund, so as to make it profitable, instead of suffering it to remain unproductive in the hands of one of the suitors. And it is well settled, that the appointment of a receiver is a matter resting in the discretion of the court.—3 Danl. Ch. Pr. 1949 ; Skip v. Harwood, 3 Atk. 564. "It is," says Lord Hardwicke, "a discretionary power, exercised by the court, with as great utility to the subject as any authority which belongs to it," &c. The appointment of a receiver involves the decision of no right, but is designed to secure and husband the fund, that it may be appropriated, without delay or inconvenience, as the court upon the final trial may adjudge. Nothing is more common in chancery practice, than the appointment of receivers, in suits against executors, where there is danger to the fund without such appointment ; so, also, if he has wasted the effects, or in other respects has misconducted himself.—12 Vesey 5 ; 13 ib. 26 ; 3 Danl. Ch. Pr. 1956. Although mere poverty, of itself, may not furnish sufficient ground for the appointment of a receiver, as against an executor, yet, where it is coupled with other facts or circumstances, showing that he has proceeded not in accordance with law (as where

he has made private sales of the property of the estate, or is dealing with it on his private account), especially where it is doubtful whether he is, in fact, the legal representative, or is not shorn of his authority by removal, the court, in all such cases, should promptly secure the effects, by placing them in the hands of a receiver. If the executor be actually insolvent, in cases where he has given no security, it is held, generally, that a receiver should be appointed.—3 Danl. Ch. Pr. 1957; Scott v. Brecher, 4 Price's Exch. Rep. 346. Without stopping to point out the reasons which exist in this case more particularly, why a receiver should come, we should feel altogether unwarranted in holding, that the chancellor had exercised his discretion improperly. On the contrary, we entertain no doubt of the entire propriety of the order. If, on final hearing, it should turn out that the complainants have improperly invoked the action of the court, to the injury of the defendant, he has his remedy upon their bond for his indemnity.

2. But it is insisted, that the order committing Walker for contempt is void—1st, because it was an excess of jurisdiction, there being no law, or rule of practice, authorizing it; 2d, because it was not made upon notice to Walker; 3d, because it specifies or fixes no limit to the imprisonment; 4th, because, after paying the money, and thus complying with the order for disobedience to which he has been committed, he is required to enter into bond, with good security, to be approved by the register, &c., payable to said register, in the penal sum of one thousand dollars, conditioned to appear at the next term of the court and answer for the contempt; and, 5th, because Walker should have been allowed to give security that the funds should be forthcoming, and thus have been saved from the prison in the event he had disposed of the money. Let us briefly notice these objections in their order.

By the Code (§ 561), it is declared, that " the power of the several courts of this State to issue attachments, and inflict summary punishment for contempts, does not extend to any other causes than," &c. Here follow the causes, consecutively numbered, the third reading as follows : "The misbehaviour of any officer of the court, in their official transactions, or the disobedience or resistance of any officer of the

court, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree or command thereof." It is apparent, therefore, from this section, that the Chancery Court has the power to issue an "attachment for contempt" against any "party," for "disobedience to any order or decree" of the court.

Again ; section 3008 declares, that "courts of chancery may also enforce their decrees, orders, and rules, by process of attachment against the party, or officer, in contempt, or by process of sequestration against his property." The next section (3009) provides, that when the chancellor decrees that an act shall be done, he shall prescribe the time within which it shall be done. Section 3010 provides for the issue of an attachment by the register, upon the affidavit of the party entitled to have the act done, stating that the decree of the court has not been performed, under which the defaulting party may be arrested, and committed to prison until he performs such act, or until he is discharged by a special order of the chancellor extending the time for the performance ; and if, after such extended time elapse, the act is still unperformed, another attachment is to issue, upon affidavit. If the attachment cannot be executed, by reason of the officer not being able to find the delinquent, then section 3011 provides for the issue of a writ of sequestration.

These several sections of the Code give to the chancellor ample power to enforce his decrees by the process here resorted to, without which the Chancery Court would be impotent and powerless to afford relief as against a refractory suitor.

Nothing is said as to serving the party with a writ of execution of the decree before he can be put in contempt, nor of any notice to him that an attachment will be moved for. With respect to each, as applicable to the facts of this case, we do not hesitate to say, they were unnecessary. Walker was in court, and had personal notice of the order requiring him to pay the money in his hands to the receiver. He asked for no further time within which to pay the money, nor for leave to give security for its forthcoming at any future period. He submits to the order, and then, as the affidavits show, leaves the village with a view of evading it. Such being the

facts, the process of attachment may well issue without further notice. The most stringent English practice never required that a party should have *personal service* of the writ of execution of the decree, when he was personally present, and must have known of the order requiring him to act *instanter*.

In Rider v. Kidder, 12 Ves. jr. 202, Lord Chancellor Erskine said : "The reason of requiring personal service is, *non constat*, that there is a contempt; that the party knows he has neglected to do anything he was called upon to perform. But in this instance," he added, " a decree made when the defendant was present in court, she knows she has not done what she was directed to do, and must therefore be conscious that she is in contempt."

So, also, in De Manneville v. De Manneville, 12 Ves. jr. 203, personal service was dispensed with, it appearing plainly that the defendant had notice from his presence in court when the order was made. These were instances of *short orders*, as they were termed, fixing a period when the decree was to be enforced. The modern practice in England is, to dispense with short orders, and serve the defendant with a copy of the decree, which is required to fix the time of the performance ; the party adding a memorandum, that on failure to comply, by the time limited, the defendant will be liable to be arrested, and have his estate sequestered. This, however, is by an order made in August, 1841.—2 Danl. Ch. Pr. 1250.

Without now deciding what would be the proper practice, as to notice of decrees made in defendant's absence, as a preliminary step to putting him in contempt, we feel no hesitation in saying, that no further notice in cases' of the kind before us, under the provisions of our Code, is required. Where the party, being present in court, is ordered to pay over to an officer of the court, the receiver appointed under its order, a specified sum, admitted to be in his hands, he is in contempt when he attempts to depart the court for the purpose of evading the order. If further notice was required, in the language of Lord Chancellor Erskine, " the defendant might, when called upon to pay the money, keep out of the way, and so prevent the effect of a decree or order made when he was present in court."—12 Ves. jr. 202.

The counsel is mistaken in supposing that the order of

commitment in this case is for an unlimited time. The defendant is to be detained in custody, until he complies with the decree of the court, and finds surety for his appearance at the next term thereof, to answer for the contempt in departing the court for the purpose of evading its previous order. Its duration is dependent upon the defendant himself. He may make his confinement long or short, as he may readily comply with the requisitions of the writ, or obstinately refuse such compliance. We see nothing erroneous in this.

As to the requirement of a bond to appear and answer for a contempt, we think the chancellor did not exceed his jurisdiction, but exercised it regularly. If a party sets at defiance an order or decree of the court, in contempt of its authority, a just regard on the part of the judge for the majesty of the law, as well as for the dignity of his station as a minister of justice, requires that he should promptly vindicate its supremacy, by punishing the offender. The payment of the money merely, while it terminates the contempt arising out of its non-payment, does not efface the contempt of the previous refusal. For this, the chancellor has full power to punish. It is indispensable, in the administration of justice, that men should be made to respect the laws of the land and the judgments and decrees of its accredited officers, and should not be allowed with impunity to array themselves in opposition to their authority when properly exercised.

As to the position that Walker should have been allowed to enter into bond, &c : We think this was a matter addressed to the discretion of the chancellor. He was certainly not bound, as a matter of law, to allow a bond to be given, before he could order an arrest for contempt. If this were so, he might obtain bonds *ad infinitum*, without obtaining the money; for, if Walker may give bond, as a matter of right, for failing to comply with the decree requiring him to pay this money, he may give another when proceeded against upon the bond, and so on without end. Such is not the law. He answers that he has the money ; if he has, he can readily hand it over to the receiver. In doing this, no right which he possesses will be affected without compensation. If, however, he has parted with the money since the order was made, this would furnish additional reason for his arrest, since it would amount

to a conversion of the fund in defiance of the decree, thus aggravating the contempt.

Upon the whole case, we feel well assured that the action of the chancellor is warranted by law and by the practice of the court, and we therefore refuse to award any process to annul or modify it. We have purposely avoided a decision upon the merits of this controversy, because such an opinion would be prematurely made on this preliminary motion, and is not called for as necessary in the decision of it.

Motion denied, with costs.